1                IN THE UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF CALIFORNIA
2

3     JOHN HESSELBEIN,
            Plaintiff,
4
      vs.                              Sacramento, California
5                                      No. CV. S-11-2157
      PAUL BECKHAM, et al.,            FRI., NOVEMBER 13, 2015
6           Defendants.               11:51 a.m.
      _____/
7
                     PARTIAL TRANSCRIPT OF JURY TRIAL
8                  CROSS-EXAMINATION OF ANDREW HALL

9         BEFORE THE HONORABLE WILLIAM B. SHUBB, DISTRICT JUDGE
                            ---oOo---
10

11    APPEARANCES:

12      For the Plaintiff:          Law Office of Stewart Katz
                                    555 University Avenue, Suite
13                                  270
                                    Sacramento, California  95825
14                                  By:  Stewart Katz
                                    Attorney at Law
15

16      For the Defendants:         Ferguson, Praet & Sherman
                                    1631 E. 18th Street,
17                                  Santa Ana, California  92705
                                    By: Bruce Daniel Praet
18                                  Attorney at Law

19
        Official Court Reporter:    Kimberly M. Bennett,
20                                  CSR, RPR, RMR, CRR
                                    501 I Street
21                                  Sacramento, California 95814
                                    (916) 442-8420
22

23
        Proceedings recorded by mechanical stenography, transcript
24      produced by computer-aided transcription

25

1          (Prior proceedings held, not transcribed.)

2          (11:51 a.m.)

3          (The Witness, ANDREW HALL, previously sworn)

4                          CROSS-EXAMINATION

5     BY MR. PRAET:

6     Q.   Good morning, Mr. Hall.

7     A.   Good morning, sir.

8     Q.   You and I have actually known each other for over 25 years,

9     going back to when you were a sergeant, right?

10    A.   That's correct.

11    Q.   In fact, all the way through when you were chief, you

12    actually retained me to defend lawsuits for your agency, didn't

13    you?

14    A.   That's correct.

15    Q.   Your agency even had a few officer-involved shootings,

16    didn't they?

17    A.   They did.

18    Q.   One of those involved a guy that Sergeant Penalla, on your

19    agency, shot and killed because he believed the guy had a gun,

20    right?

21    A.   This -- can you help put it in context?

22    Q.   Sure.  It's the guy with the cell phone.

23    A.   Yes.

24    Q.   Okay.  And it later turned out the guy was only pretending

25    to have a gun, right?

1   A.   That's correct.

2   Q.   But Sergeant Penalla believed, based on what he saw at the

3   time, the guy actually had a gun?

4   A.   That's correct.

5   Q.   And he killed that guy, didn't he?

6   A.   He did.

7   Q.   Killed the guy who had the cell phone?

8   A.   Correct.

9   Q.   You -- as the chief of police, that was one of the cases

10  you reviewed to determine whether or not the officer's conduct

11  was reasonable under your policies, right?

12  A.   That's correct.

13  Q.   And based on the totality of the circumstances of that

14  instance, you found that the shooting of the guy with the cell

15  phone was reasonable and proper, didn't you?

16  A.   Correct.

17  Q.   That's because shootings must be viewed from the totality

18  of the circumstances available to the officer at the time,

19  right?

20  A.   Say that again.

21  Q.   That's because a shooting by a police officer has to be

22  viewed under the totality of the circumstances presented to the

23  officer at the time?

24  A.   Correct.

25  Q.   As opposed to, like, in a courtroom, right?

1    A.  Correct.

2    Q.  You retired as a chief in 2010?

3    A.  I formally retired in 2009, was retained on a -- a contract

4    until 2010.

5    Q.  So you came back and worked part-time as the chief

6    through -- into 2010?

7    A.  Continuing into 2010.

8    Q.  You're still getting your retirement from the Public

9    Retirement System?

10   A.  Yes.

11   Q.  What percentage of your salary are you still getting?

12   A.  Of my public retirement?

13   Q.  Yes.

14   A.  I retired at 90 percent.  Just under.

15   Q.  At what percent?

16   A.  Just under 90 percent.

17   Q.  So you're still getting 90 percent of your chief pay?

18   A.  Yeah.

19   Q.  And since you retired as chief of police, you're partially

20   supplementing your income by critiquing police cases such as

21   this, right?

22   A.  This was -- I have supplemented my income with critiques

23   like this, correct.

24   Q.  You have?

25   A.  Yes.

1   Q.  Yes.  Okay.

2       For example, you're charging $250 an hour in this case to

3   critique the conduct of Officer Beckham?

4   A.  That's correct.

5   Q.  How much have you billed so far, not counting today?

6   A.  Be about $7,000.

7   Q.  Out of all the cases you've critiqued, since you retired,

8   of police officers' conduct, you've never testified in favor of

9   a police officer in a use of force case, have you?

10  A.  I've never testified at deposition or --

11  Q.  Or trial.

12  A.  Correction, Arpaio.  One.

13  Q.  I'm sorry?

14  A.  Arpaio.

15  Q.  I didn't understand what you said.

16  A.  The Arpaio case, I did testify in favor of police.

17  Q.  When was that?

18  A.  Early -- Arizona versus Arpaio, 2010 or '11.  Right after.

19  Q.  Was that a use of force case or a jail case?

20  A.  Well, it was use of force too.

21  Q.  In a jail?

22  A.  Yes.

23  Q.  In every field situation that you've critiqued as an

24  expert, paid expert, you've found that the officers were always

25  in fault -- at fault, haven't you?

 1   A.  Correct.

 2   Q.  Wouldn't you agree that it's critical for you in putting

 3   yourself out as an expert witness that you be impartial and --

 4   when you form the opinions that you're getting paid to give?

 5   A.  Of course.

 6   Q.  But in this case, Mr. Hesselbein's attorney, Stewart Katz,

 7   told you -- before you even reviewed the entire file, told you

 8   that he thought the shooting was improper, didn't he?

 9   A.  He -- yes.  I discerned that from what he said to me.

10   Q.  When I took your deposition, you told me Mr. Katz told you

11   he thought the shooting was improper, and you hadn't reviewed

12   the file yet, had you?

13   A.  Hadn't reviewed it completely, no.

14   Q.  He told you he was going to pay you $250 an hour to

15   critique Officer Beckham, didn't he?

16   A.  To review the case and come up with an independent

17   decision.

18   Q.  Having already been told what the attorney thought you

19   should say?

20   A.  Correct.

21   Q.  Now, you talked about the recognition of life as being one

22   of the most important things an officer needs to consider in a

23   use of force situation, right?

24   A.  Reverence.

25   Q.  Reverence for life?

1    A.  Reverence for life.

2    Q.  Does that reverence for life include the police officer's

3    life?

4    A.  Of course.

5    Q.  You talked about officers selecting least amount of force;

6    do you remember that?

7    A.  Least amount of force reasonably necessary.

8    Q.  Okay.  Well, isn't it true police officers are not required

9    to select the least amount of force, but only that amount of

10   force which they believe is reasonable at the time?

11   A.  Correct.

12   Q.  Okay.  So they don't have to select the least amount of

13   force, only what they believe, based on what they're facing, is

14   reasonable?

15   A.  Well -- okay.  But we train officers to revere life and to

16   use those options that are most likely to preserve life.

17   Q.  If an officer believes he's about to be shot by a gun,

18   what's the appropriate response?

19   A.  To shoot first.

20   Q.  Okay.  And when you talked about the imminent nature of a

21   threat, if a suspect says, I have a gun, is refusing to comply

22   with the officer's requests to stop moving but, in fact, he

23   instead shoves his hands down his waistband, is that an

24   imminent threat to the officer?

25   A.  No.

1    Q.   Why not?

2    A.   Because he'd already been searched by a sergeant and two

3    officers who were looking for a gun, who didn't find one.  And

4    they placed him inside the patrol car, where he was constantly

5    observed by another officer until this happened.

6    Q.   Back up for a second.

7         He was searched by a sergeant and two officers?

8    A.   Yes.

9    Q.   That's your understanding?

10   A.   Yes.  Well, the search was at the -- Iannone, Bornhoeft and

11   Diaz.

12   Q.   They all three did the search?

13   A.   No.  Bornhoeft did the search.

14   Q.   Okay.  And --

15   A.   But the other two were watching.

16   Q.   I see.  And it's your understanding that Officer Bornhoeft

17   was rushed when he did the pat-down?

18   A.   It's -- it's not my understanding he was rushed.

19   Q.   Did you read his deposition?

20   A.   I did.

21   Q.   Did he say it was raining?

22   A.   I don't recall raining.

23   Q.   Do you recall him saying that they wanted to get

24   Mr. Hesselbein out of the street as quickly as possible because

25   they didn't know if there were any other suspects in the house?

1   A.   That's correct.  But they didn't have any reason to believe

2   there were any other suspects in the house.

3   Q.   They had reason to believe that Mr. Hesselbein, okay, had

4   pointed a gun at them, right?

5   A.   Right.

6        They believed there was a child in the house.

7   Q.   Right.  And did you read where Mrs. Hesselbein had told

8   officers she was concerned about the people that were hanging

9   out with her husband?

10            MR. KATZ:  Object.  Relevance.  Assumes facts not --

11            THE COURT:  Well, if she said there were other people

12   in the house --

13            MR. KATZ:  But she didn't.

14            THE COURT:  -- then that's a proper subject of

15   cross-examination.

16            MR. KATZ:  But he knows they didn't, Your Honor.

17            THE COURT:  He can ask, and the witness can --

18   Q.   BY MR. PRAET:  Did she say whether or not she knew there

19   was a gun in the house?

20   A.   I don't recall.

21   Q.   Didn't she say she wasn't sure?

22   A.   As I recall.

23   Q.   Didn't she say she wasn't sure because of the other people

24   that had been hanging out at the house?

25   A.   But they were not in the house at the time.  They were not

 1    believed to be in the house at the time, just a two-year-old.

 2    Q.  She didn't even know Mr. Hesselbein was in the house, did

 3    she?

 4    A.  He was in custody in the front.

 5    Q.  I'm sorry?

 6    A.  He was in custody in the front.

 7    Q.  No.  Mrs. Hesselbein, when she -- when the officers got

 8    there, she didn't know where Mr. Hesselbein was, did she?

 9        In fact, she thought he had already left, which is why she

10    went back to the house, right?

11        So we didn't know if Mr. Hesselbein was in there, we didn't

12    know if anybody else was in there other than the child, right?

13    A.  Correct.

14    Q.  Certainly it was proper for officers to clear the house for

15    any additional suspects, right?

16    A.  Yes.  Well, to clear the house.

17    Q.  Right.  And the reason you clear a house is for any

18    additional suspects, right?

19    A.  Any people, correct.

20    Q.  Okay.  Anybody else who may be a threat to the officers,

21    and that was proper, wasn't it?

22    A.  Correct.

23    Q.  Okay.  So when they're out in the street doing this quick

24    pat-down of Mr. Hesselbein, it would be appropriate to get him

25    out, and get themselves out, of potential harm's way, standing

1    out in the middle of the street in the rain, right?

2    A.  It would never be appropriate to do such a rushed pat-down

3    that you might miss a firearm on a suspect that you thought was

4    armed.

5    Q.  In your 30 plus years in this business, you've certainly

6    heard of lots of cases where suspects have been searched and

7    handcuffed and turned out to have a gun, haven't they?

8    A.  I've heard of cases.

9    Q.  Right.  In fact, police officers have been killed by

10   suspects who turned out to have been searched and handcuffed

11   but still had guns in the back of a police car, haven't they?

12   A.  Correct.

13   Q.  You've heard of that?

14   A.  Correct.

15   Q.  All right.  So, getting back to your statement about

16   imminent, okay, if a suspect who is believed to have a gun, and

17   has said he has a gun, is refusing to comply with the officer's

18   demands to stop moving, and instead shoves his hands down back

19   into the back of his pants, is that an imminent threat to the

20   officer if the guy comes out with a gun?

21   A.  If he comes out with a gun?  Yes, if he comes out with a

22   gun.

23   Q.  What if he doesn't come out with a gun but instead shoots

24   through his pants?

25   A.  In this case there was no reason to believe he had a gun.

1   They had -- he -- other than his statement.  They had searched

2   him.  They had put him in the car.  They'd observed him

3   continually.  He had been belligerent; belligerent before they

4   put him in the car, belligerent now that he's in the car.  He's

5   intoxicated, running off at the mouth.  He's being belligerent.

6   Q.  So it's your testimony, as an expert, that if a guy says he

7   has a gun that they have no reason to believe he had a gun?

8   A.  I'm very concerned about what he's saying, but I'm saying

9   that that, per se, is not the reason -- is not sufficient fear,

10   is not sufficient reason to kill him when he puts his hands

11   where you can't see them.

12   Q.  But it's sufficient to not wait to see if it's a cell phone

13   or a gun?

14   A.  It's -- I'm sorry?

15   Q.  In the case that you reviewed when you were chief of

16   police.

17   A.  He saw something in his hands.

18   Q.  He saw something, right?

19   A.  Correct.

20   Q.  He was gesturing as if he was going to have a gun?

21   A.  He was holding a phone as if it was a gun.

22   Q.  But Sergeant Penalla didn't wait to see if it was a cell

23   phone, he shot because he thought, I'm about to get shot,

24   right?

25   A.  Well, if Hesselbein had removed his cell phone from his

1    pants, that might have been different.

2    Q.  Well, Mr. Hesselbein made the election -- instead of

3    complying, he made the election to look directly at the

4    officer, shove his hands down his pants after he's been told

5    that his grape is going to get peeled, right?

6    A.  Correct.

7    Q.  Okay.  It's your testimony that's not imminent?

8    A.  Correct.

9              MR. PRAET:  Your Honor, now might be a good time.

10             THE COURT:  Okay.  We'll take the noon recess at this

11   time.

12        Remember the admonition, ladies and gentlemen.  We'll

13   resume at 1:30.

14        (Recess taken, 12:03 p.m. - 1:28 p.m.)

15        (Proceedings held, not transcribed.)

16        (Jury present, 1:41 p.m.)

17             THE COURT:  The jurors are all present.

18        Ladies and gentlemen, I have some good news for you.  We

19   are not going to be meeting Monday.  So when we adjourn today,

20   the next court day will be Tuesday.  So you can make your plans

21   accordingly.

22        All right.  Mr. Praet, you may continue with your

23   cross-examination.

24             MR. PRAET:  Thank you, Your Honor.

25   Q.  BY MR. PRAET:  Before lunch, Mr. Hall, you had talked about

1    the totality of the circumstances that the officer's conduct

2    needs to be viewed under at the time of the -- at the time of

3    the incident, correct?

4    A.  Right.

5    Q.  Okay.  When you reviewed the facts of this case, Officer

6    Beckham in this case knew that Mr. Hesselbein had reportedly

7    threatened and chased his wife, right?

8              MR. KATZ:  Objection.  Relevance.

9              MR. PRAET:  It was over dispatch.

10             THE COURT:  Right.  So the way you phrased it, it

11   sounds like he knew it from some other source.  He just knew it

12   because he had read the dispatch report, right?

13   Q.  BY MR. PRAET:  He heard it over the radio that the report

14   was domestic violence, with Mr. Hesselbein threatening and

15   chasing his wife?

16   A.  Correct.

17   Q.  Okay.  Officer Beckham also knew that Mr. Hesselbein had

18   reportedly just been released from prison for murder, right?

19   A.  I don't recall it saying murder.

20   Q.  187?

21   A.  Correct.

22   Q.  And 187 is murder, right?

23   A.  He'd just been released from prison.

24   Q.  Right.  For 187.  And 187 to a police officer means murder,

25   right?

1        Okay.  I didn't hear your answer.  I'm sorry, you have to

2    speak up.

3    A.  Okay.

4    Q.  Was that a yes?

5    A.  Yes.

6    Q.  Okay.  He knew that other officers had reportedly seen --

7    or had reported that they had seen Mr. Hesselbein with a gun

8    when they first approached the house, right?

9    A.  Yes.

10   Q.  And you would agree that it's wrong for anyone to go back

11   and use 20/20 hindsight to judge an officer's conduct out at a

12   scene versus, let's say, in the comfort of a courtroom, right?

13   A.  It has to be viewed through the eyes of a reasonable

14   officer in the same set of circumstances at the time.

15   Q.  Under all the conditions, and stresses, and weather, and

16   everything else?

17   A.  That were in place at that time, correct.

18   Q.  Okay.  By the way, when Officer Jimenez reported that he

19   had seen Mr. Hesselbein with a gun, Officer Jimenez also

20   reported that Mr. Hesselbein had said, at the same time he took

21   the position as if he had a gun, quote, I've got something for

22   you, mother fuckers, didn't he?

23   A.  Correct.  He said that.  He didn't perceive that

24   accurately, but he said that.

25   Q.  Okay.  How did Officer Jimenez not perceive that

1    accurately?

2    A.   He -- there is no evidence that he had a gun.

3    Q.   I understand.  I'm talking about the comment.

4    A.   Oh, I don't know what he said.  Yes.  Correct.

5    Q.   Okay.  Officer Jimenez did see Mr. Hesselbein take a

6    position that would commonly be referred to as a shooting

7    stance, right?

8    A.   We know that that's what Mr. Jimenez said.

9    Q.   And that's what Officer Beckham knew?

10   A.   Was relying on.

11   Q.   Right.  At the time.

12   A.   Correct.

13            THE COURT:  Again, just so the jury understands,

14   you're not asking him whether that is a fact that Jimenez

15   observed this, you're asking whether Beckham understood that

16   Jimenez had observed that?

17            MR. PRAET:  Correct.  Well, the witness has reviewed

18   Jimenez's testimony, and we'll put Jimenez on to say what he

19   saw.

20            THE COURT:  You can put Jimenez on, but you can't ask

21   him hearsay about what Jimenez saw.  You can ask him what he

22   understood Beckham knew.

23            MR. PRAET:  And that's the context.

24            THE COURT:  All right.

25   Q.   BY MR. PRAET:  You saw where, after Mr. Hesselbein was

1   placed in the back seat of the police car, he slammed his head

2   against the wire grate?

3   A.  Yes, he did.

4   Q.  And he uttered something to the word, Fuck?

5   A.  An expletive, yes.

6   Q.  Do you agree that that's kind of self-destructive behavior?

7   A.  It's uncommon behavior.  I don't know self-destructive, but

8   it's uncommon.

9   Q.  It's certainly not enhancing his health, is it --

10  A.  No.

11  Q.  -- to slam his head against --

12  A.  No, it's not healthy behavior.

13  Q.  Okay.  Now let's go to the point where Robinson announces

14  to Beckham, and everybody around there, that Mr. Hesselbein is

15  claiming to still have a gun.

16      Is it reasonable for Officer Beckham to have relied on

17  another officer's comment that he, Hesselbein, is still

18  claiming to have a gun?

19  A.  It's reasonable for Officer Beckham to consider that, among

20  a host of other variables, when deciding to make his decisions.

21  Q.  Right.  But it's reasonable for him to believe another

22  police officer, isn't it?

23  A.  Correct.

24  Q.  You would agree that no police officer should take it as a

25  hundred percent guarantee that someone who's been searched

1   can't still have a gun, wouldn't you?

2   A.  I would.

3   Q.  Because they've been searched doesn't guarantee there is no

4   gun?

5   A.  Correct.

6   Q.  Now, your experience as a police officer -- basically you

7   were, what, 30 years --

8   A.  Yes.

9   Q.  -- in law enforcement?

10  A.  Yes.

11  Q.  And about four years of those was actually on the street as

12  a street cop, right?

13  A.  Well, I -- as a patrol officer, because I also worked a

14  detective assignment, and I worked as a supervisor in the

15  field.

16  Q.  I'm talking about, yeah, as a street cop, responding to

17  domestic violence calls, making car stops, doing what street

18  cops do.

19  A.  Patrol officer, about four years.

20  Q.  Then I think, your words, right after you left patrol you

21  became the chief's gofer, adjutant?

22  A.  Adjutant.

23  Q.  You called yourself a gofer for the chief?

24  A.  The adjutant.

25  Q.  In your four years on the street at Westminster, you

1    actually recalled a situation in which a, quote, searched

2    prisoner still managed to have a hidden gun.  Do you remember

3    that?

4    A.  I remember a gun being found in a patrol car after the

5    prisoner had been removed.

6    Q.  And after that prisoner had already been searched, right?

7    A.  Correct.  But I don't know if they were searching him for a

8    gun, or what the circumstances before that were.

9    Q.  When you arrest a person and put them in handcuffs, isn't

10   it good practice to search them for weapons?

11   A.  Of course.  Of course.

12   Q.  So the guy in Westminster, during just your four years,

13   fair to say he had been searched for weapons?

14   A.  Correct.  Yes, he had been searched for weapons.

15   Q.  And he still had a gun.

16       Now, you testified earlier that the officers should have

17   just left the door shut and stood behind the police car; is

18   that right?

19   A.  I think they should have shut the door and stepped behind

20   the seat pillar.

21   Q.  You're not a firearms expert, are you?

22   A.  No, sir.

23   Q.  But even you would agree that a bullet can go through the

24   side of a car or the trunk of a car?

25   A.  It can.  It's not likely, but it can.

1    Q.   It's not likely?

2    A.   Right.

3    Q.   Have you ever shot a bullet at a car?

4    A.   I have not.

5    Q.   Okay.  So you have no idea if it's going to go through?

6    A.   Just from my experience and training.  We take cover behind

7    them.  We use cars for concealment and cover.

8    Q.   There is a difference between concealment and cover, right?

9    A.   Correct.

10   Q.   You use the car door for concealment and hope that it

11   works?

12   A.   It deflects a bullet, correct.

13   Q.   You would agree that a bullet -- you wouldn't stand behind

14   a rear window of a car in hopes it would stop a bullet, would

15   you?

16   A.   A car door is going to be more effective than no cover at

17   all.  So, it is effective.  It does stop bullets.

18   Q.   What do you base that on?  Have you got any experience?

19   You just said you've never fired a bullet into a car.

20   A.   My training.

21   Q.   What training do you have that says a bullet is not going

22   to go through a car?

23        What experience do you have?

24   A.   We were trained to use our police cars for cover and

25   concealment.

1   Q.  Right.  But is there anything in your background or

2   training that tells you that you can rely on the metal of a car

3   to say that a bullet is not going to go through it?

4   A.  No, nothing I can cite to.

5   Q.  And yet you were willing to stand up here and say that

6   these officers should have just stood behind the car?

7   A.  I think it's common sense.  If you step to the back of the

8   seat pillar, that would mean if Hesselbein fired a weapon it

9   would have to go through the rear seat of the car, through the

10  trunk of the car and to the officers.  And I would be happy if

11  they stepped several yards back, or if they went back much

12  farther than that once the car door is shut.

13  Q.  Now, that's something the officers could have done in your

14  opinion, right?

15  A.  Correct.

16  Q.  They're not required to do that, were they?

17  A.  No.

18  Q.  Okay.  And you already told us that that's your opinion in

19  20/20 hindsight?

20  A.  I think that -- if they're trying to formulate a plan -- if

21  the idea is to preserve life and formulate a plan on how to

22  resolve the matter safely, I think that's the obvious thing to

23  do.

24  Q.  To you?

25  A.  Correct.

1    Q.  Okay.  Now, you would also agree that police officers have

2    no duty to retreat, wouldn't you?

3    A.  I would.

4    Q.  And yet if these officers had retreated, as you say, which

5    they had no duty to do, that would have essentially turned this

6    into a felony car stop, right?

7    A.  Similar to that, yes.  I mean, that's how I would have

8    approached it, as a felony car stop.  Like that.

9    Q.  Where you've got somebody you believe to be armed --

10   A.  Armed suspect in a car in front of you and you have -- you

11   extract them.

12   Q.  When I took your deposition, on a felony car stop, one of

13   the first things a police officer should do would be to cover

14   the suspected armed suspect at gunpoint, correct?

15   A.  From a safe distance.

16   Q.  And how far is a safe distance from a bullet?

17   A.  We take covers one, two, three car lengths behind.  We'll

18   park our cars one, two, three car lengths behind and cover the

19   car from there.

20   Q.  Okay.  You said there were other alternatives the officers

21   could have used, is that right, other than retreating?

22   A.  Could.

23   Q.  Is that right?

24   A.  Correct.

25       I didn't use the word "retreat."  That's your word.  I

1    think stepping back, standing -- stepping back, formulating a

2    plan is not retreating.  And I don't equate not -- not pushing

3    the -- the action as aggressively as possible the same as

4    retreating.

5        I think they had time to shut the door, step back and

6    formulate a plan.  And I don't think that's retreat.

7    Q.  One of the things that you suggested in your plan here is

8    that they could have just waited for the guy to sober up,

9    right?

10   A.  They could have waited.  They had time.

11   Q.  How long would it take Mr. Hesselbein to sober up after 15

12   beers?

13   A.  Four hours.  Six hours.  It's a human life.  If it had

14   taken three days, that would have been fine.

15   Q.  Do you believe these officers went in there thinking they

16   were going to shoot and kill Mr. Hesselbein?

17   A.  I think -- excuse me.  You think those officers went in

18   there, or you think --

19   Q.  Yeah.  Do you think that these officers, when they walked

20   up to find out what Mr. Hesselbein meant when he said, I have a

21   gun, that they intended or planned to shoot him?

22           MR. KATZ:  Object.  Relevance to that question, Your

23   Honor.

24           THE COURT:  Well, I think you're asking him about

25   more than one person.

1    Q.  BY MR. PRAET:  Let's talk about Beckham.

2    A.  I think Beckham was prepared -- imminently prepared to

3    shoot.  Not that he intended to shoot him at that moment when

4    he walked up, but I think he pushed that -- that whole thing

5    right up front.

6    Q.  When you make a felony car stop and you're pointing a gun

7    at somebody, you're prepared to shoot that person if

8    circumstances dictate, right?

9    A.  Sure.

10   Q.  Sergeant Penalla, in your agency, was prepared, when he

11   pointed a gun at the guy with the cell phone, to shoot that

12   guy, right?

13   A.  Correct.

14   Q.  Only when circumstances dictate that it was appropriate in

15   the officer's mind to pull the trigger did he pull the trigger?

16   A.  But Beckham drove this issue.  Those guys didn't drive

17   theirs.

18   Q.  Did Officer Beckham drive it or did Mr. Hesselbein drive it

19   when he said, I have a gun?

20   A.  Hesselbein brought the gun into play, but Beckham drove the

21   issue by walking to the open door, standing there and making

22   demands.

23   Q.  And if Mr. Hesselbein hadn't said, I have a gun, it would

24   have been appropriate for Officer Robinson to drive him to jail

25   and, just, this case is over, right?

1   A.   To drive him to jail and book him.

2   Q.   To book him, right?

3   A.   Correct.

4   Q.   Nothing -- just like Officer Beckham thought when he was

5   going back to his patrol car, this thing was over, right?

6   A.   Correct.

7   Q.   Until Mr. Hesselbein said, I have a gun, that's what

8   changed it, right?

9   A.   Correct.

10  Q.   Okay.  Now, what are the other options you think the

11  officers should have used other than standing back, waiting

12  three to six hours for him to sober up?  What else?

13  A.   I think they could have formulated a plan to approach the

14  car if they'd wanted.  They would have approached from one

15  direction.  I think they could have -- if they liked, they

16  could have put tear gas in the car.  The window was open.

17  Q.   Okay.  Let me stop you one at a time.

18       So you're saying that they could have approached it from

19  one side, not both, right?

20  A.   Correct.

21  Q.   Which is exactly what they did, didn't they?  They

22  approached it from the right side?

23  A.   Initially approached it from the right -- left, then the

24  right, then the sergeant went to the left and he was told to

25  move away.

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC -- (916) 442-8420

1   Q.  Which is good not to have officers on both sides of the

2   car, right?

3   A.  I would have had Beckham join his sergeant on the left side

4   rather than remain on the right side.

5   Q.  So it's your opinion they picked the wrong side?

6   A.  Yes.

7   Q.  Because in your opinion, if Mr. Hesselbein, in fact, had a

8   gun, he could have only shot toward his feet, right?

9   A.  Correct.

10  Q.  He couldn't sit up and shoot to his left?

11  A.  He wasn't sitting up, he was lying down.

12  Q.  Of his own volition, right?

13  A.  Tipped over.

14  Q.  Okay.  Was there something preventing him from sitting up?

15  A.  He hadn't sat up.

16  Q.  I'm sorry?

17  A.  He wasn't sitting up.

18  Q.  Okay.  Was there something preventing him from sitting up

19  if the officers approached from the left side?

20  A.  No.

21  Q.  Okay.  Anything else you think the officers could have

22  done?

23  A.  I -- I'm -- the tactical part of it, they had time to think

24  of alternatives.

25  Q.  Okay.  But you've already testified that officers aren't

1    required to use alternatives, just as long as they use

2    reasonable force under the circumstances, correct?

3    A.  We want them to preserve life.

4    Q.  Including their own?

5    A.  Correct.

6    Q.  Okay.  The tear gas you said, where was the tear gas going

7    to come from?

8    A.  It could have come from anywhere.  It could have come from

9    another officer's car, they could have brought it to the scene.

10   But there was access to the vehicle, the window was open.

11   Q.  And so you're talking about, like, pepper spray?

12   A.  They could have put pepper spray in.

13   Q.  Have you ever used pepper spray?

14   A.  I have.

15   Q.  What does it do to all the officers in the vicinity?

16   A.  If they're standing in front of the pepper spray, they may

17   be affected by it.  If they're not standing in front of it, it

18   doesn't do anything.

19   Q.  So there is no residual cloud in the area when they handle

20   the individual, or anything like that?

21   A.  Different types of pepper spray.  If it's a stream, no.

22   Q.  Virtually every felony car stop you made during your four

23   years on the street, when the suspect -- you thought the

24   suspect might have a gun, the only thing you ever did was point

25   a gun back at him, right?

1    A.  Correct.

2    Q.  You never pointed pepper spray or put tear gas into a car

3    when you thought somebody had a gun, did you?

4    A.  I never had a handcuffed suspect sitting in a car that I

5    was trying to remove at gunpoint.

6    Q.  You said that they should have -- should they have asked

7    Mr. Hesselbein what he meant when he said, repeatedly, I have a

8    gun?

9    A.  Yes.  In fact, they did.  Robinson did.

10   Q.  Right.  Robinson asked Mr. Hesselbein, What do you mean?

11   A.  What do you mean?  Very reasonable question.

12   Q.  What did Mr. Hesselbein say?

13   A.  He was unresponsive.

14   Q.  Didn't he say, I have a gun, again?

15   A.  Correct.  He didn't explain.

16   Q.  Right.  You would agree, with all of the information that

17   Officer Beckham had up to this point, from the very beginning

18   of this call, and all the information, that it became even more

19   critical now that Mr. Hesselbein was actually claiming to have

20   a gun, more believable?

21       I can go through the facts again if you want, but I think

22   you know them.

23   A.  I think there is a -- in the totality, all the facts

24   considered, I think that it was a much more reasonably if he

25   wasn't armed than he was.  Because he -- they'd watched him,

1    he'd get searched, they'd watched him be put in the car, he was

2    handcuffed, he was in a secure patrol car and there had been an

3    officer posted next to the car watching him the entire time.

4    Q.  Just like the guy at Westminster who had been searched and

5    turned out to have a gun?

6    A.  There is always a case where you can come up with somebody,

7    sometime, somewhere, but in practice that officer had --

8    Officer Beckham had every reason to believe that guy was secure

9    and was in that car securely.

10   Q.  Talking about his belief that he had a gun, was it

11   reasonable to believe that Mr. Hesselbein was telling the truth

12   when he was telling officers, I have a gun?

13   A.  He had reason to be concerned, but we couldn't have taken

14   that as fact.  It was inconsistent with everything he'd seen.

15   Q.  Inconsistent with the fact that he's been told he just got

16   out of jail for murder?

17   A.  Nothing -- everything -- inconsistent with what he'd seen.

18   Q.  Inconsistent with the fact that he's associated with a

19   violent street gang?

20   A.  All of that notwithstanding, since all that, he had been

21   handcuffed, searched by a sergeant and two other officers,

22   placed in the back seat of a patrol car and had been watched

23   continuously since then.

24   Q.  And you just testified no officer should take that as a

25   hundred percent certainty he doesn't have a gun?

1    A.  Correct.

2    Q.  In fact, when the guy says, I have a gun, the officer

3    should believe him, shouldn't he?

4    A.  The officer should be concerned.

5    Q.  Now, Officer Beckham didn't shoot Mr. Hesselbein simply

6    because he said he had a gun, did he?

7    A.  No.

8    Q.  Instead, Officer Beckham made very clear, plain English

9    orders to Mr. Hesselbein to stop moving, didn't he?

10   A.  Correct.

11   Q.  If Mr. Hesselbein had followed those orders and stopped

12   moving, would it have been appropriate for Officer Beckham to

13   shoot him?

14   A.  No, I don't -- no.  It was inappropriate for him to shoot

15   him anyway, but it wouldn't have been appropriate if he'd

16   followed orders.

17   Q.  Mr. Hesselbein had an obligation to comply with those

18   orders, didn't he?

19   A.  He was intoxicated.  He was being belligerent.  He should

20   have followed orders, but it's not uncommon that intoxicated

21   people don't.

22   Q.  Intoxicated people do stupid things, don't they?

23   A.  They do.

24   Q.  It gets them hurt, doesn't it?

25   A.  It's not uncommon to tell an intoxicated person to do

1    something and to have them completely ignore you.

2    Q.  According to the evidence that you reviewed, after

3    Mr. Hesselbein elected, drunk or otherwise, not to comply with

4    the officers' orders he, in fact, stuffed his hands down the

5    back of his pants, didn't he?

6    A.  That's what -- yes.

7    Q.  Okay.  And where are police officers taught that weapons

8    are often concealed?

9    A.  All over the body; shirts, pants, within waistbands.

10   Q.  The crack of their buttocks?

11   A.  All the areas that would have been searched a few moments

12   earlier while Hesselbein was being taken into custody.

13   Q.  Are you aware that Officer Bornhoeft says he didn't

14   actually feel the crotch or between the buttocks?

15   A.  No.

16           MR. KATZ:  Objection.  Misstates his testimony.

17           THE COURT:  I don't remember what he said.  The jury

18   will remember what he said.

19   Q.  BY MR. PRAET:  This peel your grape comment, you had no

20   problem understanding what Officer Beckham meant by that

21   comment, did you?

22           THE COURT:  Does anybody really understand that?  Do

23   you know what peel the grape means?

24           THE WITNESS:  No.

25           THE COURT:  Nobody has ever heard of that.

1          THE WITNESS:  I've heard it as vernacular.  I do not

2    know that it means shoot somebody in the head.  That was the

3    first time I ever learned that.

4    Q.  BY MR. PRAET:  After Mr. Hesselbein failed to comply with

5    several orders from Robinson and Beckham, when Beckham finally

6    said, Stop moving or I'll peel your grape, did Mr. Hesselbein

7    finally react?

8    A.  He continued to move, so he must -- maybe he didn't

9    understand the importance of peel your grape.

10   Q.  Should he have understood the importance of the first three

11   or four orders?

12   A.  He should have stopped moving, but I don't know if he

13   understood peel your grape if he kept moving after that too.

14   Q.  What did he do after the peel your grape comment?  What

15   did --

16   A.  He put his hands in his waistband.

17   Q.  Put his hands in his waistband, looked at Officer Beckham,

18   right, and shoved his hands further into his waistband?

19   A.  That's what Officer Beckham testified to.

20   Q.  And that's when Officer Beckham pulled the trigger, right?

21   A.  Correct.

22   Q.  Now, I think you testified Officer Beckham never actually

23   saw the gun, right?

24   A.  He -- there was no --

25          MR. KATZ:  Objection --

1    A.   -- gun.

2         MR. KATZ:   Thank you.

3    Q.   BY MR. PRAET:   Did Officer Beckham say he saw any

4    protrusion or the point of what could have been a gun pressing

5    from inside Mr. Hesselbein's pants?

6    A.   No.

7    Q.   You would agree a police officer doesn't have to actually

8    see a gun to shoot, does he?

9    A.   He has to see something that gives him a credible fear.

10   Q.   Like reaching for a gun after you've said you had a gun?

11   A.   Like the shape of a gun.  Some -- some object in his pants

12   that could be mistaken.  The cell phone in somebody's hand

13   pointed at the officer.  Those kind of things.

14   Q.   Let me ask you, if an officer reasonably believes that a

15   suspect claiming to have a gun is reaching into their waistband

16   for a weapon, would you expect the officer to shoot?

17   A.   So from your scenario, the belief that he's armed is

18   reasonable, and the belief that he's reaching into his

19   waistband for the weapon is reasonable, then the officer can

20   fire.

21   Q.   In fact, that's exactly what you said in your deposition.

22   If an officer reasonably believes that a suspect claiming to

23   have a gun is reaching into their waistband for a weapon, then

24   you, Andrew Hall, would expect the officer to pull the trigger

25   and shoot him?

1  A.  If those were reasonable beliefs.

2  Q.  Based on the totality of the circumstances Officer Beckham

3  had up to that time, right?

4  A.  We're talking about a hypothetical officer.  I wasn't

5  talking about Officer Beckham.

6      A hypothetical officer, with all those things being

7  reasonable, I would say yes.

8      Officer Beckham did not have those things and I say no.

9  Q.  So it's only whether or not Officer Beckham's belief was

10  reasonable, if he reasonably believed that Mr. Hesselbein had a

11  gun, after claiming to have one, and he reasonably believed

12  that Mr. Hesselbein was reaching into his waistband for a

13  gun --

14  A.  For that weapon.

15  Q.  Right.

16  A.  If that was all reasonable.

17  Q.  Right.  Then you agree that Officer Beckham is fine to pull

18  the trigger, right?

19  A.  That would be reasonable.

20  Q.  And you would agree that given all of the circumstances

21  that Officer Beckham had up to the point where Mr. Hesselbein

22  reached further into his waistband, that it was much more

23  believable that he had a gun when he defiantly continued to

24  reach into his waistband, wouldn't you agree -- or haven't you

25  agreed?

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC -- (916) 442-8420

1   A.   No.   I don't necessarily understand.   I don't think I did

2   agree.   I don't agree it was reasonable for him to believe

3   there was a gun.

4   Q.   Well, let me go to page 59 of your deposition.

5   A.   Do I have that in front of me?

6   Q.   I don't know.   We lodged a copy with the Court, or I can

7   just read it.

8             THE CLERK:   The judge has it.

9             THE WITNESS:   Thank you, sir.

10      I'm on page 59.

11            MR. PRAET:   All right.   Lines 6 through 10.

12      Your Honor, may I read it?

13            THE COURT:   You can ask him if he -- if that's what

14   he said.   He's not a party so you can't just read his

15   deposition.

16            MR. PRAET:   I can read it for impeachment --

17            THE COURT:   Ask him if that's what he said.

18            MR. PRAET:   -- if he denies it.

19            THE COURT:   Right.

20            THE WITNESS:   I've read the paragraph.

21   Q.   BY MR. PRAET:   Okay.   So do you still agree, given all the

22   information these officers had, it was much more believable --

23   excuse me -- given all the information they had, these

24   officers, it was much more believable because he had reportedly

25   had a gun, based on Diaz, he's claiming he has a gun, he just

1    got out of prison for killing someone, right?

2        Your answer was:  Correct.

3        It was much more believable that he had a gun under these

4    circumstances, wasn't it?

5    A.   Than someone where all that wasn't existing, sure.

6    Q.   Right.

7    A.   It was a greater concern.  It was a greater issue.

8    Q.   Those are the facts in this case, so you agree it was much

9    more believable that Mr. Hesselbein had a gun based on the

10   facts in this case?

11   A.   It was a greater concern.

12   Q.   Right.  And if Officer Beckham reasonably believed that

13   Mr. Hesselbein's claim to have a gun was true, and reasonably

14   believed that Mr. Hesselbein was digging into his waistband to

15   get the gun he claimed he had, it's your opinion, as an expert

16   witness, the officer can pull the trigger, correct?

17   A.   If he reasonably believed those things.

18           MR. PRAET:  Thank you.  Nothing further.

19       (Further proceedings held.)

20                       (2:11 p.m.)

21                       ---oOo---

22

23

24

25

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC -- (916) 442-8420

1    I certify that the foregoing is a correct transcript from the

2    record of proceedings in the above-entitled matter.

3

4                              /s/ Kimberly M. Bennett
                              KIMBERLY M. BENNETT
5                              CSR No. 8953, RPR, CRR, RMR

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25