1             IN THE UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF CALIFORNIA
2

3     JOHN HESSELBEIN,
              Plaintiff,
4
      vs.                              Sacramento, California
5                                      No. CV.  S-11-2157
      PAUL BECKHAM, et al.,            FRI., NOVEMBER 13, 2015
6          Defendants.                 11:25 a.m.
      _____/
7
                    PARTIAL TRANSCRIPT OF JURY TRIAL
8          DIRECT AND REDIRECT EXAMINATION OF ANDREW HALL

9        BEFORE THE HONORABLE WILLIAM B. SHUBB, DISTRICT JUDGE
                         ---oOo---
10

11    APPEARANCES:

12      For the Plaintiff:            Law Office of Stewart Katz
                                      555 University Avenue, Suite
13                                    270
                                      Sacramento, California  95825
14                                    By:  Stewart Katz
                                      Attorney at Law
15

16      For the Defendants:          Ferguson, Praet & Sherman
                                      1631 E. 18th Street,
17                                    Santa Ana, California  92705
                                      By:  Bruce Daniel Praet
18                                    Attorney at Law

19

        Official Court Reporter:     Kimberly M. Bennett,
20                                    CSR, RPR, RMR, CRR
                                      501 I Street
21                                    Sacramento, California 95814
                                      (916) 442-8420
22

23

        Proceedings recorded by mechanical stenography, transcript
24      produced by computer-aided transcription

25

1          (Prior proceedings held, not transcribed.)

2          (11:25 a.m.)

3                    THE COURT:  Who is your next witness?

4                    MR. KATZ:  Andrew Hall.

5                    THE CLERK:  Sir, please step forward.  Stand next to

6     the court reporter to my left and face me.

7          Raise your right hand.

8          (The Witness, ANDREW HALL, is sworn)

9                    THE WITNESS:  I do.

10                    THE CLERK:  Thank you.  You may be seated.

11          Please state your full name, spell your last name for the

12     record.

13                    THE WITNESS:  Andrew E. Hall; H-A-L-L.

14                              DIRECT EXAMINATION

15     BY MR. KATZ:

16     Q.  Good morning, Mr. Hall.

17     A.  Good morning.

18     Q.  Do you have a background in law enforcement?

19     A.  I do, sir.

20     Q.  What agency or agencies have you worked for?

21     A.  As a sworn police officer I worked for the Westminster

22     Police Department.

23     Q.  Have you worked for any other law enforcement departments?

24     A.  Thereafter I've worked as a civilian administrator over

25     public safety departments in the City of Hemet, Department of

1   Developmental Services for the State of California, and

2   California State University Los Angeles.

3   Q.  And how many years have you worked in a sworn peace officer

4   position?

5   A.  It was just under 30.

6   Q.  And what was your rank when you retired?

7   A.  Chief of police.

8   Q.  And can you tell us what year that was?

9   A.  I retired in 2010.  January 2010.

10  Q.  And before holding that rank, what other ranks did you hold

11  in a police department?

12  A.  I began the department in 1980 as an academy recruit, and

13  worked my way up through the ranks.  So sergeant, lieutenant,

14  captain, all the various ranks.  Not every position in the

15  department, but all the various ranks.

16  Q.  And do you have any formal training in law enforcement?

17  A.  Lots of it.

18  Q.  Tell us what -- tell us what some of it is.

19  A.  Hundreds -- thousands of hours of law enforcement training.

20  Some of it here, California POST-approved.  POST is California

21  Peace Officer Standards and Training.  But I've also had

22  statewide and nationwide training, and I've participated in the

23  FBI National Academy.

24  Q.  Graduate -- what year did you graduate from the FBI

25  National Academy?

1   A.   I think it was about 2002.  It's a while back now.

2   Q.   And which POST certificates do you hold?

3   A.   They would be all of the basic, intermediate, advanced,

4   executive.

5   Q.   Do you have any other law-related degrees?

6   A.   I do.  I have a -- I have a juris doctorate degree, and I'm

7   an attorney, although I don't practice.

8   Q.   Okay.  And are you here today to give expert testimony?

9   A.   Yes, sir, I am.

10   Q.   Were you retained to do that?

11   A.   I was.

12   Q.   What percentage of your income last year came from

13   testifying as an expert witness?

14   A.   None.

15   Q.   Now, in the course of your duties -- first of all, you were

16   chief of police.  What did you do for the City of Hemet?

17   A.   I was interim public safety director.  I oversaw both the

18   fire and the police department, and during a period of summary

19   organization, and we replaced the fire chief and the police

20   chief during that time.

21   Q.   And you've also worked for the State of California in a

22   number of capacities?

23   A.   As an independent consultant for the Department of

24   Developmental Services.

25   Q.   What did you do for those folks?

1    A.  We examined the Office of Protective Services, which is

2    their police department in mental health facilities, looking --

3    there had been some problems, and we were looking at various

4    things we could do to get them into best practices.

5    Q.  How many officers did that department have?

6    A.  As I recall it -- I don't recall exactly.  Over a hundred,

7    but I'm not sure.

8    Q.  And you've done work for some state colleges as well?

9    A.  Then thereafter I did work for California State University,

10   Los Angeles.  I was the associate vice president over public

11   safety, and so I reported to the vice president of the college

12   in a non-sworn capacity.  So, the first civilian oversight of

13   the police department.

14   Q.  And do you currently have a position with the state?

15   A.  Monday.  I go back Monday, work for the assistant vice

16   chancellor.  I'm doing the same thing on a statewide basis.

17   Q.  So for all of the campuses of the state universities?

18   A.  That's correct, for all 23 campuses.

19   Q.  Now, in your time working both as a sworn officer and as a

20   consultant, have you dealt with issues concerning the use of

21   force?

22   A.  Absolutely.  It comes up in every -- all the time in

23   policing.

24   Q.  And when you were with the City of Westminster, did you

25   review use of force incidents when you were a sergeant?

1   A.  Beginning as a sergeant, I would have had responsibility

2   for reviewing use of force incidents.  And I did it for my

3   officers as a sergeant, as a lieutenant, as a captain, I would

4   review those from my division.  And then, finally, as chief of

5   police, I reviewed every use of force report that came through

6   the department.

7   Q.  And when you were the chief of police, what percentage of

8   the use of force incidents for your department did you review?

9   A.  Every.  Every one that was brought to my attention I

10  reviewed.

11  Q.  In the course of your law enforcement career, including

12  your working as a consultant, what's your best estimate as to

13  how many use of force reports, or incident reports involving

14  the use of force, do you believe you've had to critically

15  review?

16  A.  Thousands.

17  Q.  Any idea how many thousands, or just thousands is your best

18  estimate?

19  A.  Less than three, maybe, more than one.  It's thousands.

20  Q.  Okay.  Now, in the course of your police work and training,

21  are there any principles that apply to the use of force?

22  A.  Of course.  We begin always with the -- you know, life is

23  sacred, and our fundamental duty is to protect people.  And so

24  we want to use the least amount of force reasonably necessary.

25  Q.  Is that something that every department you'd worked with

1    understands?

2    A.   Yes.  And in the State of California, every one I've ever

3    worked with, yes.

4    Q.   And was that a part of the basic training that every

5    officer receives?

6    A.   Yes.  Absolutely.

7    Q.   And so for that training, so the primacy is the recognition

8    that life is, in fact, sacred?

9    A.   Correct.  Absolutely.

10   Q.   And are officers -- professionally, are they supposed to

11   use as much force as they can get away with, or the minimum

12   force that's necessary, or whatever seems right?  What are

13   officers supposed to use?

14   A.   That's an important question.  It's the least amount of

15   force that's reasonably necessary.  And they should always be

16   keeping that in mind.  That should be in the back of their head

17   whether we're dealing with a suspect or a witness or a victim

18   or anybody.  Everybody -- you are trying not to have anybody

19   get hurt.

20   Q.   In terms of the use of force, are you familiar with the

21   term "deadly force"?

22   A.   I am.

23   Q.   Can you tell the jury what deadly force is?

24   A.   Deadly force is force so significant that it's likely to

25   cause serious bodily injury or death.

1    Q.   Is a handgun considered deadly force?

2    A.   Yes.

3    Q.   Is an assault rifle considered deadly force?

4    A.   Of course.

5    Q.   And are there any special rules that apply as to when an

6    officer can use deadly force?

7    A.   Deadly force is -- it's -- of course, it's irreversible.

8    It's the most significant use of force that an officer can

9    engage in, and so it requires the most amount of focus,

10   concentration, deliberation, if that's where you're going.

11   It's very -- it's unique.   It's something that --

12   Q.   Now, are there -- are you familiar with the term "imminent

13   danger"?

14   A.   Yes.

15   Q.   How does -- what's the -- how does the concept of imminent

16   danger, death and great bodily injury relate to an officer's

17   decision as to whether or not to use deadly force?

18   A.   Imminent danger is one that's present now.   It's one

19   that's -- or imminent.   It's coming.   It's close.   And it's --

20   it's in front of you at this moment.

21        And so an officer -- for example, the more time we have to

22   deal with something, the more options we have to decide how

23   we're going to do it.

24        So if we're talking about how we're going to go into a

25   house, and we're located a block away and we're making tactical

1  decisions, we have time to explore that and to look at what

2  we'll do if this happens, what we'll do if this happens.  If

3  something happens right in front of you, you walk around the

4  corner and suddenly the bad guy appears doing something, and

5  serious injury is imminent, you have less time, you've

6  compressed time, you may have only moments, just moments, to

7  make decisions.

8  Q.  Now, before an officer uses deadly force, are they supposed

9  to consider whether there are less lethal alternatives

10  available?

11  A.  If the facts present themselves that way.  If -- for

12  example, if an officer is faced with an immediate deadly threat

13  in front of him, he does not have to exhaust those less lethal

14  options, he can go right to a deadly response.

15  Q.  What if he does have the availability of options?

16  A.  The law -- well, excuse me.  We train officers that they

17  are -- they are -- it's their discretion to choose what they

18  feel they need to choose at that moment to accomplish, safely,

19  what needs to be done, with the least amount of harm to people.

20  Q.  Now, you've had a chance to review materials in this case,

21  correct?

22  A.  Correct.

23  Q.  Have you reviewed depositions?

24  A.  I have.

25  Q.  Have you reviewed reports?

1    A.   I have.

2    Q.   Have you reviewed transcripts of statements?

3    A.   I have.

4    Q.   Reviewed diagrams?

5    A.   Yes.

6    Q.   Photos?

7    A.   Yes.

8    Q.   And in the course of that, have you been able to form any

9    opinions regarding the shooting of Mr. Hesselbein?

10   A.   I have.

11   Q.   First of all, was it consistent with a reasonable officer

12   for Officer Beckham to have shot Mr. Hesselbein while in the

13   back of a patrol car?

14   A.   No, I don't believe it was.

15   Q.   Well, in regard to that opinion, did -- the fact that

16   Mr. Hesselbein was handcuffed, did that have any significance

17   to you?

18   A.   Yes, it did.

19   Q.   What's the significance to an officer if someone is

20   handcuffed and placed in the back of a patrol car?

21   A.   Well, it's even broader than that.  It's that he had been

22   searched for a weapon -- handcuffed, searched for a weapon, no

23   weapon found, then placed into the back of the patrol car.  So

24   he was secure and his hands -- his hands were handcuffed and

25   secure, he was also in a secure environment.

1   Q.   Is there any significance to you that a person is

2   handcuffed with their hands -- with their palms out?

3   A.   Yes.

4   Q.   What significance is that?

5   A.   It makes it more difficult for the person to do anything

6   with their hands.  Behind the back with the palms out, the arms

7   are less mobile, the hands are less mobile, and seizing

8   anything or doing anything with your hands while they're behind

9   the back is -- is very, very difficult.

10   Q.   Now, in this instance, is it your understanding that there

11   was a suspicion, or even belief, that Mr. Hesselbein might have

12   been armed or might have had a gun at some point?

13   A.   Prior to being put in the car?

14   Q.   Yes.

15   A.   Correct.  There is a suspicion or belief that he might have

16   been armed while he was in the house.  When he came out of the

17   house, they searched him specifically for a handgun.

18   Q.   So in your experience, would that have any significance on

19   the thoroughness of the search?

20   A.   Absolutely.

21   Q.   Why is that?

22   A.   Because you're looking for a dangerous weapon, and so that

23   would be the most thorough type of search.  You would take the

24   time.  You'd be most thorough for a search for a dangerous

25   weapon.

1   Q.   Now, he was placed in the patrol car.  Is there a standard

2   as to what people -- do officers typically search patrol cars

3   to make sure there is nothing in patrol cars?

4   A.   Correct.  And it's even a requirement of the Elk Grove

5   Police Department to search the back seat before and after your

6   shift to make sure the car is cleaned of anything for these

7   reasons:  We want the inside of a patrol car to be a secure --

8   safe, secure environment.

9   Q.   Now, do you believe that there were no alternatives for

10   Officer Beckham other than to shoot Mr. Hesselbein in the face?

11   A.   I believe there were a lot of alternatives.

12   Q.   First of all, let's assume in this case there is -- there

13   is some evidence that at least someone -- first of all, did

14   anyone ever say that Mr. Hesselbein -- to the best of your

15   understanding, that they saw a weapon when Mr. Hesselbein was

16   in the back of the car?

17   A.   Nobody saw a weapon with Mr. Hesselbein.

18   Q.   Did anyone ever report that they -- to the best of your

19   understanding for -- in terms of outlining what conduct should

20   have been done, that they thought they saw an outline of a

21   weapon?

22   A.   No.

23   Q.   Okay.  Is your opinion based on an officer expressing the

24   belief that Mr. Hesselbein had said that he had a weapon?

25   A.   Correct.  Officer Robinson heard Hesselbein say he had a

1  gun.

2  Q.  Okay.  And for the purpose of your opinion, does it matter

3  to you whether that was correct or incorrect?

4  A.  I'm sorry, whether -- whether Rob --

5  Q.  In terms of the reasonableness of Officer Beckham's

6  actions, does it matter to you whether or not Officer Robinson

7  really heard that?

8          THE COURT:  Not Robinson -- oh, I'm sorry, that's

9  what you meant?

10          MR. KATZ:  That's what I meant.

11          THE COURT:  Okay.  I'm sorry.

12          THE WITNESS:  Um --

13  Q.  BY MR. KATZ:  Did I lose you?

14  A.  Yeah. I'm sorry.

15  Q.  So is it your understanding that Officer Beckham hears from

16  Robinson that Hesselbein says he has a gun?

17  A.  Correct.  Correct.  Because it wasn't something perceived

18  by -- by Beckham, it was something perceived -- which Beckham

19  did not know.  It was perceived by Robinson, and Beckham just

20  heard somebody say.  And, in fact, what Beckham heard was

21  wrong, but Beckham heard somebody say he has a gun, which isn't

22  what was said.

23  Q.  Okay.  So let's take a step back from the particulars of

24  this case and be a little bit more general with the same basic

25  fact situation.

1          So let's say you have the handcuffed individual in a car,

2     the back of a patrol car.

3     A.   Correct.

4     Q.   There is no one else in the patrol car.  In other words,

5     the car is not moving, it's parked, there is no officer in the

6     front seat.  And an officer outside the car either hears or

7     forms the belief or suspicion that possibly the person inside

8     the car has a weapon.  What should the officers do?

9     A.   It all depends on the circumstances.  In this case --

10    Q.   Well, let's assume that the car is parked on a residential

11    street, it's 2:40 in the morning, there are no -- there is no

12    traffic, it's a residential neighborhood, and let's assume

13    there is a total of seven officers available who are on scene,

14    including a supervisor.

15    A.   I think they should have stepped back behind the car and

16    talked about it.

17    Q.   And what should they have talked about?

18    A.   Talked about what people heard, what they saw, clarified

19    what they heard, clarified what they saw, what led to that

20    belief, what they had done, what they had just done that

21    preceded it, to either validate or not validate what the

22    suspect was saying.

23    Q.   And would that -- what would that talk lead to?

24    A.   It would lead to the formulation of a plan.  I would --

25    that would be the objective, that that talk would then -- and

1   it would also lead to some people not mistaking what they

2   heard.  If they thought they heard this and they really heard

3   this, it would help normalize or help get everybody on the same

4   page, formulate a plan.  And then they have all the time in the

5   world to execute that plan.

6   Q.  What's the importance of forming a plan?

7   A.  Well, the coordination -- it's for the safety of the

8   officers, for the safety of the guy in the car.  It's for

9   everybody's safety.  Safety for the community.  And the plan is

10  just to get him secure again.  It's to get him secure, safe

11  again, if, in fact, he's even armed.

12  Q.  And why do you say they had all the time in the world?

13  A.  Because he can't exit the patrol car in this case.  He's

14  inside the rear caged area of a patrol car.  He can't open the

15  doors from the inside.  He's handcuffed.  He's not going

16  anywhere.

17  Q.  Okay.  And assuming for your example that they decide --

18  they do believe the person has a weapon, whether someone has

19  seen it or not, what would be an appropriate plan at that

20  point?

21  A.  They -- they could do a number of things.  They could -- if

22  they --

23  Q.  For example?

24  A.  For example, they could wait and give the time.  They knew

25  he was intoxicated, that he was acting belligerent.  They could

1    wait for him to sober up a little bit and get more cooperation

2    out of him as he sobered up.

3         They could have -- if they wanted to approach the car

4    tactically, they could go on one side of the car, or the other,

5    and not put themselves on both sides of the car.

6         There are a number of things.  Anything that they -- they

7    wanted to do in that terms they could do.  But they needed to

8    get together and talk about it.

9    Q.  Would it make sense to open the passenger side door if you

10   thought a person was lying on the -- if -- let's assume for

11   your facts also the person is jackknifed onto the seat; in

12   other words, their head is against the driver's side passenger

13   door.

14   A.  Sure.  That was Sergeant Iannone's idea, was the extraction

15   from the passenger side, which was a perfectly reasonable idea.

16   Q.  And how should that have been accomplished?

17   A.  He should have gotten the officers to leave the opposite

18   side of the vehicle, come around to his side, and done an

19   extraction from the driver's side.  They can open the door.

20   If, in fact --

21   Q.  I don't know if you misspoke.  Should they have gone

22   through the direction where his feet were or his head was?

23   A.  His head.  His head.  Not his feet.

24   Q.  Why is that?

25   A.  Because if he is armed, his feet are downrange.  His head

1   is safe.

2   Q.  So, in other words, if the person's hands are behind his

3   back, and his --

4   A.  And there is a weapon actually in his waistband that he can

5   reach, that weapon would necessarily be fired downrange, which

6   is toward the passenger side.

7   Q.  And from your understanding of this case, did any officer

8   attempt to do that?

9   A.  Sergeant Iannone went around to the driver's side.

10  Q.  What happened when Sergeant Iannone tried to do that?

11  A.  He was told to step away because he had stepped into

12  Beckham's line of fire.

13  Q.  Now, in this case do you have an understanding as to

14  whether or not Officer Beckham gave Mr. Hesselbein an

15  ultimatum?

16  A.  He did give Mr. Hesselbein an ultimatum.

17  Q.  And from a -- viewing an -- viewing the way officers are

18  trained and what they should do, what's the significance of

19  giving someone an ultimatum?

20  A.  An ultimatum is a bad idea, because if you say to someone,

21  if you do this, I will do that, then you've kind of left

22  yourself no alternative but to do that if they do it.  So

23  ultimatums are not -- are not a useful way of communicating.

24  We'll sometimes say them for effect, but they're not carried

25  out.

1    Q.  Now, in this case, was there a possibility to use any less

2    lethal force if they felt they needed to do something to

3    physically control Mr. Hesselbein to get him out of the car?

4    A.  Sure.  If they'd stepped back from the vehicle, they could

5    have put tear gas inside the vehicle.  They could have --

6    theoretically, when they opened the door, they might have used

7    an impact weapon, or a dog, or something like that.  Tactically

8    that would have all been up to them, but they had the time to

9    do something like that if they wanted to try.

10   Q.  Was there any time constraints that this had to be dealt

11   with, in the next two minutes or one minute?

12   A.  Only the -- only the pressure created by Beckham when he

13   stepped into the open doorway and aimed his rifle at

14   Mr. Hesselbein.  He took away their time.  He took away their

15   ability to formulate plans.

16   Q.  Now, is an officer allowed to shoot someone because they

17   have a feeling they may have a weapon on them?

18   A.  No.  It has to be a well-founded fear.  It has to be a fear

19   that -- it's not just a -- it's not just a fear, but it has to

20   be a fear that has -- you know, a credible fear, a believable

21   fear.

22   Q.  It's got to be based on reality?

23   A.  Yeah.

24   Q.  Based on facts?

25   A.  Based on something, yes.  Based on something more than just

1   a specious claim, I have a gun.

2   Q.  Is it unusual for people to tell the police they have a

3   weapon?

4   A.  Actually, it is unusual for people to tell police they have

5   a weapon.  And I don't know of any handcuffed suspects that

6   have done it, so I -- yeah, it would strike me as unusual.

7   Q.  When people are being arrested, do they sometimes act

8   different to what the officers tell them?

9   A.  Sure.  And at that time, at the time they're being taken

10  into custody, we'll often ask, Do you have a knife or gun on

11  you?  And those times they'll answer.  But it's unusual for

12  somebody, after being taken into custody, to say, I have a

13  weapon.

14  Q.  So sometimes people say, I have a weapon, you're going to

15  find the weapon, or yes, I have a weapon?

16  A.  Right.  Right.  Imminent -- as we're doing the search,

17  yeah.

18  Q.  Now, is an officer allowed to shoot someone because they

19  think he had a weapon -- whether wrongly or correctly, that

20  they had a weapon earlier in the evening?  Is that a

21  justification to shoot someone?

22  A.  No.

23  Q.  Is the fact that someone may have had a weapon, or at least

24  they heard from some other party that they thought that he had

25  a weapon earlier, does that, combined with the statement, I

1   have a gun, justify shooting someone?

2   A.  In and of itself, no.

3   Q.  If someone simply was holding a weapon, would that justify

4   shooting them?

5   A.  Different circumstances.  Depends how the weapon is being

6   held.  Aimed at the officer, then perhaps.  Aimed at the

7   ground, no.

8   Q.  So in this case is there any indication that Mr. Beckham

9   ever thought that Mr. Hesselbein was aiming anything at him or

10  anyone else?

11  A.  No.  He never saw anything that appeared to be a weapon.

12  Q.  Was it consistent with law enforcement practices for an

13  officer to shoot someone because his hands went out of view for

14  less than a second?

15  A.  No.

16          MR. KATZ:  I don't have any other questions.

17      (Cross-Examination held, previously transcribed.)

18          THE COURT:  Redirect?

19          MR. KATZ:  Sure.

20                      REDIRECT EXAMINATION

21  BY MR. KATZ:

22  Q.  So, in this case, and part of the totality of the

23  circumstances, was one of the things you considered that

24  Beckham is standing directly in front of Hesselbein for between

25  one and two minutes with an unrestricted view of his hands

1    basically?

2    A.  Correct.  Well -- correct.

3    Q.  And was it significant to you that he did not report seeing

4    anything that appeared to him to be the outline of a weapon

5    within Mr. Hesselbein's clothing?

6    A.  He did not see anything, nor did anyone else.

7    Q.  Was that significant to you?

8    A.  Yes.

9    Q.  And was it your belief that, in view of this concern, that

10   Officer Beckham would have been looking for that?

11   A.  Yes.  And they'd also seen him place his hands inside his

12   waistband before and remove them.

13   Q.  So the fact that -- having gone in and out of the waistband

14   several times with nothing coming out, that would be something

15   that you believe would be something to consider?

16            MR. PRAET:  Objection.  Leading.

17            THE COURT:  Sustained.

18            THE WITNESS:  Those were all things --

19            MR. PRAET:  Objection.  Move to strike his answer.

20            MR. KATZ:  I can reword the question.

21   Q.  BY MR. KATZ:  Would it be significant as to whether or not

22   the person had gone in and out of their waistband previously?

23   A.  Yes.

24   Q.  And would it be significant whether or not there was

25   something in their hands when their hands went out of their

1   waistband previously?

2   A.   Yes.

3   Q.   Why would that be significant?

4   A.   It would have indicated there was nothing there.   Or

5   contributed to that belief.

6   Q.   Would there be any significance -- first of all, do you

7   have any understanding as to whether or not Mr. Hesselbein told

8   Beckham, when he's standing there between one and two minutes,

9   that he had a gun?

10  A.   He did not.

11  Q.   Does that have any significance for you?

12  A.   Yes.

13  Q.   Does that mitigate against it being reasonable to assume he

14  has a gun?

15  A.   Yes.   It -- correct.

16  Q.   Would it have any significance to you in terms of the

17  reasonableness of Officer Beckham's conduct as to whether or

18  not Mr. Hesselbein had made any threats to shoot or injure any

19  officer or third party while he was handcuffed?

20  A.   Yes, of course.   If he was threatening, I'm going to shoot

21  you, that would be much different.

22  Q.   And do you have any understanding as to whether or not, in

23  forming your opinion, Mr. Hesselbein had made such a threat

24  while in the car?

25  A.   There is no evidence of it at all.

1    Q.  As a general proposition, would it be a bit odd for someone

2    to conceal a gun and then say, I have a gun?

3    A.  I've never heard of that.

4    Q.  Okay.  Now, is it your understanding when Mr. Hesselbein

5    was on his side that he could even see out of the car apart

6    from where the door was open?

7    A.  I believe he could not see out of the car.  His head was

8    down below the bottom of the window.

9    Q.  And would that have given the officers greater ease of

10   realigning their position to safely remove Mr. Hesselbein?

11   A.  Sure.  A tactical advantage.

12   Q.  Do you believe that Sergeant Iannone could have simply

13   yanked Mr. Hesselbein out of the car as he intended to?

14   A.  I don't think he could have simply yanked him, I think it

15   would have taken two officers or two people to work at it, but

16   I think it could have been done safely.

17   Q.  And in terms of this case, was Beckham's course of conduct

18   what you would consider a split-second decision?

19   A.  No.  There wasn't -- Beckham had time, and they all had

20   time.  They had time to step back.  They had time to -- even --

21   even when the hands went into the waistband, Beckham still

22   had -- could have given himself more time by standing away from

23   the open doorway, standing back.

24   Q.  And what if, hypothetically speaking, a firearm had come

25   out, would Beckham have had adequate time to address the threat

1   at that point?

2   A.   Yes.

3   Q.   Why do you say that?

4   A.   If he'd been standing behind the window?

5   Q.   Yeah.

6   A.   The suspect wouldn't have been able to point the weapon at

7   him.

8   Q.   Would the suspect even -- would Hesselbein even know where

9   the officers were?

10   A.   Well, he may have known where Beckham was because he,

11   apparently, made eye contact with Beckham.

12   Q.   Because the door is open?

13   A.   Yeah.

14   Q.   Okay.  Now, there was some talk about a case with a

15   sergeant in Westminster.  Did that follow a high-speed car

16   chase?

17   A.   Yes, it did.

18   Q.   And there was one officer, correct?

19   A.   Correct.

20   Q.   And the person who lost their life, had they been searched?

21   A.   He had not.  And he simulated -- he turned around and

22   crouched and aimed the phone, if you will, at the officer.

23   Q.   Is it correct he had not been handcuffed?

24   A.   Correct.

25   Q.   And then at some point the chase ended; is that correct?

1   A.  Correct.

2   Q.  And the decedent bailed out of the car and started running?

3   A.  Correct.

4   Q.  And at some point did that person suddenly stop?

5   A.  Correct.

6   Q.  And what did they do after stopping?

7   A.  Turned toward the officer and simulated a weapon.

8   Q.  Is that the type of situation you consider a split-second

9   decision?

10  A.  Yes.  Yes.  That's a split-second decision.

11  Q.  Is going and standing in front of the open car door and

12  telling someone they'll -- you'll peel their grape, or peel

13  your grape if you stop -- if you either don't show me your

14  hands or if -- or alternately -- show me your hands, stop

15  moving, is that a split-second decision?

16  A.  That's a deliberate decision.  It's not a split-second

17  decision like I've been -- like we just discussed.

18          MR. KATZ:  I have no further questions.

19      (Further proceedings held.)

20                      (2:18 p.m.)

21                      ---oOo---

22  I certify that the foregoing is a correct transcript from the

23  record of proceedings in the above-entitled matter.

24                      /s/ Kimberly M. Bennett
                        KIMBERLY M. BENNETT
25                      CSR No. 8953, RPR, CRR, RMR