UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

JOHN HESSELBEIN,

        Plaintiff,

    v.

PAUL BECKHAM,

        Defendant.

CIV. NO. 2:11-2157 WBS AC

MEMORANDUM AND ORDER

----oo0oo----

      After a four-day jury trial, the jury returned a verdict in favor of defendant Elk Grove Police Officer Paul Beckham on plaintiff John Hesselbein's 42 U.S.C. § 1983 claim for excessive force in violation of the Fourth Amendment.  Plaintiff now renews his motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) and, alternatively, moves for a new trial under Rule 59.

I.   The Incident

On January 30, 2011, plaintiff's ex-wife called for emergency assistance because of a domestic dispute.  The information dispatched to the officers about the call indicated that his ex-wife said plaintiff had been drinking and was on parole for murder, which was later corrected to confirm that plaintiff had been convicted of involuntary manslaughter.  (Tr. at 154:19-25, 251:5-6.)  The officers were also informed that plaintiff was associated with the Sac Town Crips street gang in 1994.  (Id. at 197:22-198:9.)  When defendant arrived at the scene, plaintiff had voluntarily exited his home and walked into the middle of the street at the demand of other officers.  (Id. at 156:8-157:5, 200:8-18.)  Prior to plaintiff voluntarily exiting his home, Officer Jimenez said he had seen plaintiff with a gun, but none of the officers saw a gun in plaintiff's hands when he surrendered.  (Id. at 281:3-15.)

When plaintiff was kneeling in the street, Officer Andrew Bornhoeft handcuffed plaintiff's "wrists behind his back" with his palms facing out and the back of his hands together. (Id. at 127:8-13.)  He explained that handcuffing an individual with his palms facing out makes it "harder for that person to actually grab ahold of something," including a weapon.  (Id. at 127:18-23.)

After handcuffing plaintiff and lifting him to a standing position, Officer Bornhoeft searched him, which defendant observed.  (Id. at 143:18-21, 200:19-201:2.)  During trial, Officer Bornhoeft described the search he performed on plaintiff as being consistent with his training.  The search

2

included checking the front, sides, and back of plaintiff's waistband.  (Id. at 134:14-17.)  At the time Officer Bornhoeft checked plaintiff's waistband, he was aware of the possibility that plaintiff might have had a weapon and knew that the waistband is the "most commonplace for weapons to be concealed."  (Id. at 134:23-24, 135:6-9.)  After searching plaintiff's upper body, Officer Bornhoeft proceeded to search his lower body, including using a "bladed" technique to search plaintiff's groin area.  (Id. at 136:16-19, 137:9-24.)  Although Officer Bornhoeft testified that his search of plaintiff was "rushed" and did not include the "crack between [plaintiff's] buttocks," he "felt confident that [his] search was thorough."  (Id. at 139:7-16, 160:6-10.)

Plaintiff was then placed in the back of the Unit 94 patrol car.  There was no evidence at trial that any of the circumstances suggested that plaintiff could have found a weapon in the backseat of that patrol car.  Officer Bornhoeft continued to stand by Unit 94 and watch plaintiff, during which time plaintiff "flopped" over so he was laying diagonally across the back seat.  (Id. at 142:17-19, 143:16-17, 144:10-19, 188:14-150.)  In this position, the officers were able to observe plaintiff's handcuffed hands and the areas around the back of his waistband, especially because plaintiff's shirt was raised so that the skin above his waistline was visible.  (Id. at 205:13-18.)  Neither Officer Bornhoeft nor any other officer observed anything in plaintiff's hands or the outline of a firearm beneath plaintiff's clothing.  (Id. at 147:18-23, 172:21-25.)

3

After plaintiff was placed in Unit 94, defendant returned to his patrol car when he "heard some commotion" and saw "Officer Robinson get out of the car, [with] his weapon drawn and pointed to the back seat of" Unit 94.  (Id. at 260:17-21.) Defendant testified that he heard Officer Robinson saying something about plaintiff still having a gun and defendant thought it was "possibl[e]" plaintiff had a gun.  (Id. at 261:9-13, 280:1-281:2.)  None of the officers, including defendant, heard plaintiff state that he intended or wanted to shoot anyone. (See id. at 175:1-3, 181:25-182:5, 188:9-10.)

At this point, defendant returned to Unit 94 with his assault rifle drawn and stood at the open door approximately five feet from plaintiff.  (Id. at 146:22-147:4, 261:19-21.)  When defendant arrived at the patrol car, plaintiff was making a "shrugging" movement with his shoulders and other officers were yelling at him to stop moving.  (Id. at 179:12-17, 263:15-3.) Defendant explained that he "was there to provide cover while [the officers] tried to formulate how [they] were going to get [plaintiff] out of the vehicle."  (Id. at 262:4-6.)  No plan, however, was ever discussed.

With his assault rifle aimed at plaintiff's head, defendant instructed plaintiff to stop moving about two times and then told plaintiff to stop moving or he would "peel [his] grape."  (Id. at 165:6-8.)  Plaintiff did not cease the "shrugging" movement.  (Id. at 180:8-10, 206:4.)  According to defendant, "[i]mmediately after [he] told [plaintiff] [he] was going to peel his grape," plaintiff looked at defendant and "made

a final hard thrust down into the back of his pants." (Id. at 210:14-18.)  Defendant shot plaintiff in the head less than one second after defendant "completely lost sight of [plaintiff's] hands." (Id. at 187:23-25, 210:19-21, 213:3-5.)  Defendant testified that he intended for the shot to be fatal and only fired a single shot because he thought he had killed plaintiff. (Id. at 181:18-19, 213:9-13, 267:19-25.)

The time between when defendant returned to Unit 94 and shot plaintiff was about one to two minutes and the lighting was "pretty good" because of street lights and other officers' use of flashlights. (Id. at 184:18-21, 202:4-7.)  Before shooting plaintiff, defendant had a clear view of plaintiff's hands, (id. at 205:4-6), and never saw a gun or what he thought was a gun in plaintiff's hands or clothing, and none of the officers told defendant that they had seen a gun in plaintiff's hands after he was searched. (Id. at 182:8-18, 187:14-16, 188:6-8, 197:15-18, 205:19-21.)  Defendant also knew plaintiff had been searched prior to being placed in the patrol car and believed he had been searched for a weapon. (Id. at 196:11-14, 200:25-201:2, 264:15-17.)  Defendant conceded that he did not have any reason to believe that Officer Bornhoeft performed a poor search and that "nothing [] jumped out at [him] at that time" as giving him concern that plaintiff was not properly searched. (Id. 197:12-14, 201:10-12.)  Defendant also knew that plaintiff had voluntarily surrendered and was under the influence of a significant amount of alcohol. (Id. at 200:16-18, 211:22-212:8.)

Defendant testified that he believed plaintiff posed an

imminent threat of death or great bodily injury to himself and the other officers because "there was some uncertainty as to whether he still had a weapon" and plaintiff did not cease "reaching into the back of his pants" when told to stop moving. (Id. at 186:16-25.)   Defendant claimed he "thought [he] was about to be shot."   (Id. at 267:17-18.)   According to defendant, he "perceived that [plaintiff] was trying to grab something out of the back of his pants" and "it was possibly a gun."   (Id. at 187:10-12.)

During the entire incident, defendant's patrol car was parked in the line of sight of Unit 94 and equipped with a video camera.   (Id. at 235:18-22.)   Although part of the incident is recorded, defendant manually turned off his video camera after plaintiff was placed in Unit 94 even though department policy required that recording continue until the arrestee had been transported.   (Id. at 237: 14-19.)   Defendant testified he ceased recording at that time because plaintiff had been taken into custody and he felt the scene had been stabilized, even though he had not yet gotten in his car to leave.   (Id. at 237:11-24, 238:2-5.)   About one-and-a-half minutes after the shooting, defendant resumed recording and thus the shooting was not recorded.   (Id. at 275:20-276:1, 276:16-23.)   The shot to plaintiff's head was not fatal, and it was later determined that plaintiff did not have a gun on him.

II.   Discussion

Plaintiff now renews his Rule 50(b) motion for judgment

6

as a matter of law on the ground that there is not a legally sufficient basis for the jury's verdict.  Alternatively, plaintiff moves for a new trial under Rule 59 on the following grounds: (1) the admission of impermissible character evidence about defendant; (2) Officer Bornhoeft's testimony that he would have shot plaintiff; (3) defense counsel's misleading reference to a murder conviction; (4) defense counsel's suggestion of perjury by plaintiff; (5) defense counsel's "send a message" statement during closing argument; (6) a minor alleged error in the jury instructions; (7) the court's "state of mind" limiting instructions; and (8) the verdict is contrary to the clear weight of the evidence.

A.   Rule 50 Renewed Motion for Judgment as a Matter of Law

"In considering a Rule 50(b)(3) motion for judgment as a matter of law, the district court must uphold the jury's award if there was any 'legally sufficient basis' to support it." Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd, 762 F.3d 829, 842 (9th Cir. 2014) (quoting Kode v. Carlson, 596 F.3d 608, 612 (9th Cir. 2010) (per curiam)).  "When reviewing the record as a whole, 'the court must draw all reasonable inferences in favor of the nonmoving party,' keeping in mind that '"[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."'"  Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1005 (9th Cir. 2004) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).  "Judgment as a matter of law is proper if the evidence, construed

7

1
2
3
4

in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's." McEuin v. Crown Equip. Corp., 328 F.3d 1028, 1036 (9th Cir. 2003) (internal quotation marks and citation omitted).

5
6
7
8
9
10
11
12
13
14
15
16
17
18

As the jury was instructed, the Fourth Amendment requires that any use of force must be "'objectively reasonable' under all of the circumstances." (Jury Instr. No. 10); accord Graham v. O'Connor, 490 U.S. 386, 397 (1989).  Determining the reasonableness of force "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (internal quotation marks and citations omitted).  Reasonableness must be judged "from the perspective of a reasonable officer on the scene and not with the 20/20 vision of hindsight" while "consider[ing] all of the circumstances known to the officer on the scene, including:"

19
20
21
22
23
24
25
26
27
28

    1. The severity of the crime or other circumstances to
    which the officer was responding;

    2. Whether the plaintiff posed an immediate threat to
    the safety of the officer or to others;

    3. Whether the plaintiff was actively resisting arrest
    or attempting to evade arrest by flight;

    4. The amount of time and any changing circumstances
    during which the officer had to determine the type
    and amount of force that appeared to be necessary;

    5. The type and amount of force used;

    6. The availability of alternative methods; and

    7. Whether the officer warned plaintiff of the use of
    force, if giving plaintiff a warning was feasible.

8

(Jury Instr. No. 10); accord Liston v. County of Riverside, 120

F.3d 965, 976 (9th Cir. 1997) (citing Graham, 490 U.S. at 388).

The "most important" factor under Graham is whether the suspect

posed an "immediate threat to the safety of the officers or

others." Smith v. City of Hemet, 394 F.3d 689, 702 (9th Cir.

2005) (internal quotation marks and citation omitted).

   The Ninth Circuit has repeatedly held that "[a]n

officer's use of deadly force is reasonable only if the officer

has probable cause to believe that the suspect poses a

significant threat of death or serious physical injury to the

officer or others." Gonzalez v. City of Anaheim, 747 F.3d 789,

793 (9th Cir. 2014) (internal quotation marks and citation

omitted); see also Price v. Sery, 513 F.3d 962, 970 (9th Cir.

2008) (holding that "probable cause" and "reasonable belief" are

synonymous when assessing the nature of a threat giving rise to

the use of deadly force).[1]

   "'A simple statement by an officer that he fears for

his safety or the safety [of] others is not enough; there must be

_____

   [1]   While the Ninth Circuit has overruled its prior holding
that a "deadly force" instruction is mandatory, see Acosta v.
Hill, 504 F.3d 1323, 1324 (9th Cir. 2007), it has still held that
the use of deadly force violates the Fourth Amendment unless "the
officer has probable cause to believe that the suspect poses a
significant threat of death or serious physical injury to the
officer or others." Gonzalez, 747 F.3d at 793; see also Scott,
550 U.S. at 394-95 ("Although [Tennessee v. Garner, 471 U.S. 1
(1985)] may not, as the [majority] suggests, 'establish a magical
on/off switch that triggers rigid preconditions' for the use of
deadly force, it did set a threshold under which the use of
deadly force would be considered constitutionally unreasonable:
'Where the officer has probable cause to believe that the suspect
poses a threat of serious physical harm, either to the officer or
to others, it is not constitutionally unreasonable to prevent
escape by using deadly force.'") (Stevens, J., dissenting).

objective factors to justify such a concern.'" <u>Bryan v. MacPherson</u>, 630 F.3d 805, 826 (9th Cir. 2010) (quoting <u>Deorle v. Rutherford</u>, 272 F.3d 1272, 1281 (9th Cir. 2001)).  Under the objective inquiry governing the Fourth Amendment, "a law enforcement officer's use of force will be justified, or not, by what that officer <u>reasonably believed</u> about the circumstances confronting him." <u>Price</u>, 513 F.3d at 968 (emphasis added).

Here, it is undisputed that plaintiff was searched prior to being placed in Unit 94 and, although the search may have been rushed, Officer Bornhoeft testified that he was looking for a gun in his thorough search that included plaintiff's groin and waistband.  After being searched, plaintiff was placed in the back of the secure patrol car and, because he "flopped" over, his hands, waistband, and backside were visible to the officers.  Not a single officer testified that he saw anything even giving rise to the suspicion that plaintiff had a gun in the crack of his buttocks.

Although one officer claimed he saw plaintiff holding a gun before plaintiff voluntarily surrendered, none of the officers saw plaintiff holding a gun when he voluntarily exited his home.  The evidence at trial was that plaintiff could have hidden the gun anywhere in his house before surrendering and defendant testified that it was not surprising that their quick search of the home did not uncover a gun.  (Tr. at 257:19-258:13.)

When he returned to Unit 94 with his assault rifle drawn, defendant then learned that another officer said plaintiff

had said he had a gun.  Not a single officer testified that plaintiff said he had a gun on his person or somehow hidden in the crevice of his buttocks.  Neither defendant nor any of the officers were aware of any other fact that tended to suggest that the intoxicated and slender individual who had been searched somehow secreted a gun in the crack of his buttocks.

Under the circumstances of this case, where plaintiff had been thoroughly searched for a weapon and was handcuffed in the back of a secure patrol car, it would seem to the court that the only reasonable response to the statement, "I have a gun" would be for an officer to ask, "Where?"  Given that plaintiff had been seen with a gun in his hand before he voluntarily surrendered, it was entirely likely that plaintiff was telling the officers that there was a gun in his house.  When the officers knew that plaintiff's two-year-old son was still in the house, his concern that the officers remove a gun before taking him into custody would be entirely understandable.  The point is not that the officers should have known what plaintiff meant, but it would appear to the court that the only reasonable response under the circumstances of this case would have been to ask plaintiff where he had a gun before shooting him in the head. The court simply does not understand how a jury could find from the evidence presented in this case that a reasonable officer would have believed plaintiff had a gun hidden in the crack of his buttocks based exclusively on the improbable statement that he had a gun.

Even assuming a reasonable officer would have believed

11

plaintiff had a gun hidden somewhere that was not discovered during the search, "[t]he mere fact that a suspect possesses a weapon does not justify deadly force."  Hayes v. County of San Diego, 736 F.3d 1223, 1233 (9th Cir. 2013) (internal quotation marks and citation omitted); see also Harris v. Roderick, 126 F.3d 1189, 1204 (9th Cir. 1997) ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed.").  Although plaintiff said he had a gun, he did not threaten any of the officers or say anything to suggest that he intended to use the gun to shoot the officers.  By defendant's own testimony, it is much more common for someone not to announce that he has a weapon before attempting to assault officers.  (Tr. at 196:17-197:2.)

        At most, plaintiff did not stop "shrugging" and reaching his hands below his waistband over a period that could not have exceeded two minutes.  Based on this evidence, a reasonable officer would not have believed that plaintiff posed an immediate risk to the safety of the officers.  Even assuming a reasonable officer would have believed plaintiff had a gun in the crack of his buttocks, plaintiff's hands were handcuffed behind his back with his palms facing out and the undisputed testimony was that this made it more difficult for plaintiff to use his hands.  (Id. at 127:18-23; see also id. at 306:14-18 (Andrew Hall testifying, "[When a suspect is handcuffed b]ehind the back with the palms out, the arms are less mobile, the hands are less mobile, and seizing anything or doing anything with your hands

while they're behind the back is -- is very, very difficult.").)

In order to pose a risk to the officers, plaintiff would have had

to somehow retrieve the gun with one hand from its clandestine

location, manage to aim it from behind his back in the direction

of the officers without shooting himself, and somehow pull the

trigger before any of officers surrounding the car could respond.

It boggles the court's mind how the jury could find plaintiff

posed an immediate threat to the officers under these facts.

Nor do the other Graham factors shed light on how the

jury reached the verdict it did.  First, the inquiry considers

the "severity of the crime or other circumstances to which the

officer was responding."  (Jury Instr. No. 10.)   While defendant

testified that a domestic violence call is not a "run-of-the-

mill" call because there has already been violence, (Tr. at

250:1-4), any dispute had ended and plaintiff had voluntarily

exited his home by the time defendant arrived and defendant

testified that the situation had stabilized.  While a reasonable

officer may have perceived some heightened risk that evening due

to the information relayed to the officers by dispatch, plaintiff

had been searched, handcuffed, and placed in the back of a secure

patrol car at the time defendant used excessive force.  The

severity of the crime and circumstances were low at the time

defendant shot plaintiff in the head.

"Whether the plaintiff was actively resisting arrest

or attempting to evade arrest by flight" is also relevant to the

inquiry.  There is no argument this factor could weigh in favor

of defendant as plaintiff was handcuffed and in custody when defendant used deadly force.

"[While] police officers need not employ the least intrusive degree of force . . . the presence of feasible alternatives is a factor to include in [the] analysis." Bryan, 630 F.3d at 813 (Wardlaw, J., concurring in the denial of rehearing en banc) (internal quotation marks, citations, and emphasis omitted); (see also Jury Instr. No. 10 (instructing the jury to consider "[t]he availability of alternative methods").) At trial, plaintiff's expert Andrew Hall, who had almost thirty years of experience as a police officer, opined that the circumstances of this incident, including that plaintiff had been searched, handcuffed, and placed in the patrol car, provided the officers with "a lot of alternatives." (Tr. at 307:20.) For example, Hall testified that the officers could have closed the door to the patrol car and stepped behind the car to formulate a plan or that they could have put tear gas in the car, used an impact weapon, or a canine. (Id. at 309:10-310:14, 313:10-18.) They could have also gone to the side of the car nearest plaintiff's head and attempted to extract him, which the testimony at trial revealed was what Sergeant Mike Iannone was attempting to do until defendant told him to step away because he was in defendant's line of fire. (Id. at 311:12-312:21.)

Although shooting plaintiff in the head may have been the quickest way to respond to the possibility plaintiff had a gun, "[a] desire to resolve quickly a potentially dangerous

14

situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." See Bryan, 630 F.3d at 826 (internal quotation marks and citation omitted).

The inquiry also considers "[t]he amount of time and any changing circumstances during which the officer had to determine the type and amount of force that appeared to be necessary." (Jury Instr. No. 10.)  Hall testified at trial that the circumstances, including the fact that plaintiff was in a secured environment from which he could not escape, gave the officers ample time to formulate a plan before immediately resorting to deadly force.  (Tr. at 310:13-25.)  There was no evidence to dispute this testimony.

"Whether the officer warned plaintiff of the use of force, if giving plaintiff a warning was feasible" is also relevant to reasonableness.  (Jury Instr. No. 10); see also Gonzalez, 747 F.3d at 797 ("The absence of a warning does not necessarily mean that [the] use of deadly force was unreasonable[,] . . . [but when giving] a warning was practicable[,] the failure to give one might weigh against reasonableness.").  This factor could weigh in favor of defendant because defendant did tell plaintiff to stop moving or "I'll peel your grape," if anybody knew what that meant.  Defendant testified he believed "peel your grape" is "street vernacular" for shooting someone in the head, even though he had admittedly never heard the saying used in the five years prior to the incident.  (Tr. at 209:3-5, 266:15-21.) Plaintiff's expert, who

15

had served as a sworn police officer for almost thirty years and retired as the Chief of Police of Westminster, (id. at 298:12-16), testified that he had heard "peel your grape" as vernacular, but did not understand it to mean shooting someone in the head. (Id. at 352:5-7.)  The court is skeptical as to whether a reasonable officer would expect this baffling expression to provide a genuine warning.

Based on all of these circumstances, the court does not understand how the jury found that a reasonable officer would have perceived plaintiff as posing an imminent threat necessitating the immediate use of deadly force one second after plaintiff's hands were no longer visible despite the fact that he had been searched and was handcuffed in the back of a patrol car and not a single officer observed anything resembling a gun.

Nonetheless, the court must respect the jury's decision.  The Seventh Amendment entitled both parties to a jury, Buckles v. King County, 191 F.3d 1127, 1140 (9th Cir. 1999), and both parties exercised that right, (Docket No. 53).  "[A] decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter."  Landes Const. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1371 (9th Cir. 1987) (internal quotation marks and citation omitted).  On the narrow inquiry under Rule 50, moreover, the court must accept the inferences and findings that the jury apparently drew even if the court does not agree with or understand them.  Under this

16

extremely deferential review, the court cannot find that there is no legally sufficient basis for the jury's verdict and must therefore deny plaintiff's renewed motion for judgment as a matter of law.

      B.    <u>Rule 59 Motion for a New Trial</u>

      Pursuant to Rule 59, a "court may, on motion, grant a new trial . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  Rule 59 does not specify the grounds on which a motion for a new trial may be granted, and thus "the court is bound by those grounds that have been historically recognized."  <u>Molski v. M.J. Cable, Inc.</u>, 481 F.3d 724, 729 (9th Cir. 2007) (internal quotation marks and citations omitted).  "[E]ven if substantial evidence supports the jury's verdict, a trial court may grant a new trial if 'the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.'"  <u>Silver Sage Partners, Ltd. v. City of Desert Hot Springs</u>, 251 F.3d 814, 819 (9th Cir. 2001) (quoting <u>United States v. 4.0 Acres of Land</u>, 175 F.3d 1133, 1139 (9th Cir. 1999)).

      "Unlike with a Rule 50 determination, the district court, in considering a Rule 59 motion for new trial, is not required to view the trial evidence in the light most favorable to the verdict.  Instead, the district court can weigh the evidence and assess the credibility of the witnesses."  <u>Experience Hendrix L.L.C.</u>, 762 F.3d at 842.  The Ninth Circuit

has emphasized that, under Rule 59, the district court has "'the duty . . . to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence.'" Molski, 481 F.3d at 729 (quoting Murphy v. City of Long Beach, 914 F.2d 183, 187 (9th Cir. 1990) (omission and alterations in original).  At the same time, "a district court may not grant a new trial simply because it would have arrived at a different verdict." Silver Sage Partners, Ltd., 251 F.3d at 819.

In Gates v. Rivera, the Ninth Circuit held that an officer's testimony that he had not previously shot anyone is inadmissible because "[c]haracter evidence is normally not admissible in a civil rights case."  993 F.2d 697, 700 (9th Cir. 1993); see also Fed. R. Evid. 404(a)(1) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."); Fed. R. Evid. 404 advisory committee's note ("The Rule has been amended to clarify that in a civil case evidence of a person's character is never admissible to prove that the person acted in conformity with the character trait."). As the Ninth Circuit explained, "The question to be resolved was whether, objectively, [the officer's] use of force had been excessive," and thus the officer's "past conduct d[oes] not bear on that issue."  Gates, 993 F.2d at 700.

18

Despite <u>Gates's</u> clear holding, defense counsel began his cross-examination of defendant by establishing that the defendant had never shot anyone prior to shooting plaintiff:

> Q. Officer Beckham, as you sit here today, how long have you been a police officer?
>
> A. Over 13 years.
>
> Q. During your 13-year career, how many arrests would you say you've made?
>
> A. More than a thousand.
>
> Q. Of those arrests that you've made, how many of those do you think involved a suspect either having a gun or claiming to have a gun?
>
> A. Possibly between 150 to 200. Possibly.
>
> Q. Other than this incident on January 30, 2011, had you ever -- have you ever shot anybody?
>
> A. No, sir.

(Tr. 247:21-248:8.)

Plaintiff's counsel objected and moved to strike the question and answer and the court sought guidance from plaintiff's counsel as to whether the evidence was relevant before ruling on the objection.  Instead of articulating why the evidence was not relevant as the court requested, plaintiff's counsel simply assumed the court had ruled and said the question was "fine":

> MR. KATZ: Objection, Your Honor.  Relevance.  Move to strike.
>
> THE COURT: I suppose the point is that all these other people that claimed they had guns didn't get shot.
>
> MR. PRAET: Exactly.
>
> THE COURT: Would that be relevant or not, Mr. Katz? Do you think that might be relevant?

MR. KATZ: The Court has ruled, Your Honor.  That's fine.

THE COURT: I don't know.  I'm just trying to --

MR. KATZ: That's fine.

THE COURT: -- think it through.   I'll overrule the objection.

(Id. at 248:6-21.)  Had plaintiff cited Gates during trial or had not given up on his objection before the court had a chance to rule on it, the court would have stricken defendant's testimony about his past conduct.

Nonetheless, the jury's consideration of this impermissible character evidence merits a new trial unless the error was harmless.  Gates, 993 F.2d at 700.  "In answering this question [the court] must undertake a review of the trial as a whole and look at the case as it would have stood if [the officer's] answers had not been in evidence."  Id.  This "hypothetical" inquiry seeks to "ascertain the likelihood that these particular jurors in this particular case were influenced in their verdict by the improperly-admitted answers."  Id.  In Gates, the Ninth Circuit ultimately concluded that, under the circumstances of that case, the officer's "self-serving testimony about his past conduct with guns did not enhance his credibility."  Id. at 700-01.

Here, however, the court cannot find that these particular jurors in this case were not improperly influenced by the inadmissible character evidence.  Crucial to the jury's verdict was whether the jury found that a reasonable officer would have believed that plaintiff in fact had a gun.  At trial,

20

defendant testified that he thought he was going to get shot merely because it was "possible" plaintiff had a gun.  Based on all of the circumstances and his demeanor while testifying, the court believes that even though defendant may have thought it was possible plaintiff had a gun, he must have believed it was more probable that plaintiff did not, and thus his claimed fear that he was going to get shot was not credible.[2]

Unlike in <u>Gates</u> where there was physical evidence corroborating the officer's fear, <u>see id.</u> at 700, there was not a single piece of physical evidence that corroborated defendant's fear in this case.  Defendant relied exclusively on an ambiguous statement and a shrugging movement by an individual who had been searched for a weapon, handcuffed, and placed in the back of a patrol car.  Notwithstanding the court's doubt that defendant truly and reasonably believed plaintiff had a gun, the jury apparently found his testimony credible and gave it significant

---

[2]   Plaintiff's counsel also elicited testimony that undercut the court's assessment of defendant's credibility at trial.  For example, although it cannot be heard on the video and defendant "had a hard time hearing" after the shooting because of the "ringing" in his ears from firing his assault rifle, (Tr. at 243:19-21, 246:9-13, 275:22-23), defendant claimed plaintiff said something to the effect of "He did the right thing, I could have had a gun" and also that "he wanted to die," (<u>id.</u> at 277:10-13; <u>see also id.</u> at 244:12-14).  While these surprising statements cannot be heard in the post-shooting video, instead plaintiff can be heard moaning and expressing his pain and difficulty breathing.  (Pl.'s Tr. Ex. 57B; Tr. at 243:22-25.)  The court did not find this testimony credible and, based on the cross-examination surrounding these statements, believes defendant likely fabricated these statements in an effort to justify his use of force.  The court was also baffled by defendant's testimony that he said he intended "peel your grape" as a warning that he would shoot plaintiff in the head.

weight.  Under these circumstances, defendant's impermissible
character evidence about the fact that he had not shot a suspect
in the 150 to 200 prior arrests in which suspects claimed to have
guns likely affected the jury's assessment of whether defendant
believed he was going to get shot in this case.

Not only was it likely that the jury considered this
impermissible character evidence in assessing defendant's
credibility, it is also likely the jury improperly considered the
testimony on the ultimate issue of reasonableness.  When the
court asked defense counsel at oral argument on this motion why
defendant's past conduct was relevant, counsel argued that the
fact defendant has never shot anyone shows that defendant is an
objectively reasonable officer.  The controlling inquiry is
whether an objectively reasonable officer under the same or
similar circumstances would have shot the plaintiff, not whether
defendant is or was a reasonable officer.  It would have been
entirely impermissible for the jury to infer that because
defendant had never shot anyone in the past, his decision to do
so in this case must have been necessary or reasonable.  This is
precisely the improper inference defense counsel invokes to argue
that the character evidence was relevant.

The prejudice from allowing the jury to consider such
past conduct is also illustrated by Dupard v. Kringle.  In that
case, the plaintiff alleged the defendants used excessive force
against him and the district court allowed the defendants to put
forth evidence at trial showing that excessive force complaints
had never been lodged against them before the incident with

plaintiff.  See Dupard v. Kringle, 76 F.3d 385, at *1, *3 (9th Cir. 1996).  The Ninth Circuit reversed the judgment and remanded for a new trial based on the jury's consideration of that evidence.  Id. at *4.  The Ninth Circuit explained that such testimony was inadmissible character evidence because the "only relevance of testimony that the marshals had never had excessive force complaints filed against them was as proof that, in the instance at issue, they did not use excessive force against [plaintiff]."  Id. at *3.  It concluded that a new trial was necessary because it could not "say that it is unlikely that the jury's verdict in favor of the marshals was not substantially influenced by the jury's knowledge that the marshals had never had excessive force complaints lodged against them."  Id. at *4.  Although Dupard is unpublished and therefore not precedent, it confirms the weight such impermissible character evidence likely had in this case.

In the ordinary case where the evidence to support the verdict is stronger, the court may be able to find with some level of confidence that self-serving testimony that the defendant had not shot someone in the past did not improperly influence the jury.  In this case, however, the court simply cannot understand how the jury found that a reasonable officer would have believed plaintiff had a gun and that it was reasonable to use deadly force against plaintiff when he had been searched, handcuffed, and placed in the patrol car.  When the evidence supporting the verdict is as scant as it was in this case, it is likely that the inadmissible character evidence

tipped the scales too far and resulted in what the court believes is a miscarriage of justice.[3]

Accordingly, after undertaking its "'duty . . . to weigh the evidence as [the court] saw it," the jury's consideration of inadmissible character evidence causes the court great concern that a miscarriage of justice occurred and the court must therefore grant plaintiff's motion for a new trial. Molski, 481 F.3d 724, 729 (9th Cir. 2007) (quoting Murphy, 914 F.2d at 187) (omission and alterations in original).

IT IS THEREFORE ORDERED that plaintiff's renewed motion for a judgment as a matter of law be, and the same hereby is, DENIED; and plaintiff's motion for a new trial be, and the same hereby is, GRANTED.

The Clerk is instructed to vacate the judgment of November 18, 2015 (Docket No. 94) and this matter is set for a status conference on March 28, 2016 at 1:30 p.m. to set a new trial date.

Dated:  March 9, 2016

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

---

[3]    Because the court will grant plaintiff's motion for a new trial based on the jury's consideration of the inadmissible character evidence, the court need not address plaintiff's remaining arguments in favor of a new trial.

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28